UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE 1:14-CV-21388-DPG

ALVIN GALUTEN

vs.

COMMUNITY HEALTH OF
SOUTH FLORIDA, INC.

_____/

**FIRST AMENDED RETALIATORY DISCHARGE COMPLAINT
UNDER THE FEDERAL CIVIL FALSE CLAIMS ACT,
WITH SUPPLEMENTAL CLAIM FOR ATTORNEYS' FEES AND COSTS
PURSUANT TO FLA. STAT. 448.08 FOR PREVAILING ON CLAIM OF
FAILURE TO PAY WAGES, WITH REQUEST FOR JURY TRIAL**

## INTRODUCTION

1. Plaintiff Alvin Galuten brings this action for violations of the anti-retaliation provisions of the federal Civil False Claims Act, 31 U.S.C. § 3730(h), with a supplemental Florida law claim for attorneys' fees pursuant to Fla. Stat. § 448.08 for having prevailed on an unpaid wages claim.

2. Plaintiff alleges that Defendant Community Health Center of South Florida, Inc. was violating certain health care laws and regulations; that Plaintiff complained about the violations and refused to participate in them; that he was discharged by Defendant; and that Plaintiff's complaints and/or refusal to participate in the unlawful acts was a motivating factor in Defendant's decision to discharge him and not to pay him accrued wages.

3. Plaintiff further alleges that he filed this lawsuit originally on April 17, 2014, alleging in part, specifically in Count 2 thereof, that Defendant had failed to pay him all wages owed to him for his approximately last two weeks of work—totaling approximately $15,630.71 ($1,953.09 plus $13,677.62).

4. That claim was for "UNPAID WAGES"—not for unpaid *minimum* wages pursuant to Fla. Stat. 448.110.  The count never mentioned minimum wages.  Had only minimum wages been sought, the amount claimed would have been a small fraction of the $15,630.71 that was claimed.

5. On or about October 2, 2014, Defendant tendered Plaintiff $15,630.71, less withholdings of $5,221.90 for federal income taxes, Social Security and Medicare.

6. That payment renders Plaintiff the prevailing party on that wage claim, for which he is entitled to attorney's fees and costs pursuant to Fla. Stat. 448.08.

## JURISDICTION AND VENUE

7. Defendant has transacted business in the Southern District of Florida, specifically in Miami-Dade County.

8. Most of the acts complained of herein occurred at Defendant's offices in this District.

9. Therefore, this is a proper venue under 28 U.S.C. §1391(b).

10. This Court has federal question/"arising under" jurisdiction and diversity jurisdiction, as well as supplemental jurisdiction under 28 U.S.C. § 1367.

## PARTIES

11. Plaintiff **Alvin Galuten** is a person of the full age of majority and a resident of Tennessee.

12. Defendant **Community Health of South Florida, Inc.** ("CHI") is an active Florida non-profit corporation, and at all material times herein conducted business in Miami-Dade County.  Its principal address is 10300 S.W. 216 Street, Miami, Florida 33190.

## FACTS

### A.  THE MEDICARE AND MEDICAID PROGRAMS

13. In 1965, Congress enacted the **Medicare Program**, Title 18 of the Social Security Act, under 42 U.S.C. § 1395 et seq., authorizing the Government to pay for the costs of certain medical services.

14. The Government, through the Department of Health and Human Services ("HHS"), administers the Medicare Program.

15. Part B of the Medicare Program is a federally subsidized health insurance system for disabled persons, blind persons, and persons aged 65 and older.

16. Part B generally covers 80% of reasonable charges and items other than hospital expenses, and 100% of clinical diagnostic laboratory services.

17. HHS has delegated the administration of the Medicare Program to its component agency, the Center for Medicare and Medicaid Services ("CMS").

18. The Medicare Program reimburses health care providers for appropriate medical services.

19. The **Medicaid Program**, created by Title 19 of the Social Security Act of 1995, codified at 42 U.S.C. § 1195 et seq., was designed to provide similar benefits to qualifying low-income individuals. The Government funds part of the Medicaid Program in each State. Each State basically funds the remainder.

20. At all relevant times herein, Defendant was a qualified health care provider and government contractor through the Medicaid and/or Medicare Programs.

21. Like all government contractors providing health care services under Medicaid and/or Medicare, Defendant certified that, before treating Medicaid and/or Medicare patients and accepting Medicaid and/or Medicare funds/reimbursement, it would operate in accordance with the requirements established by the Secretary of HHS.

**B.   REGULATIONS CONCERNING RADIOLOGY SERVICES**

22. Medicaid and Medicare reimburse for radiology services only if the test is medically reasonable and necessary, and properly utilized for bona fide diagnostic or therapeutic purposes. See 42 U.S.C. §§ 1395i(a)(1)(A) and 1395y(a)(1); 42 CFR Pts. 405 and 441, 46 Fed. Reg. 485550 (eff. Oct. 1, 1981). Participating providers are required to ensure that their services are supported.

23. At all material times herein, Defendant had knowledge of, or was charged with knowledge of, the laws, regulations, and public policies expressed by these laws, in order for reimbursements to be approved for coverage under Medicaid and Medicare.

24. When submitting claims for reimbursement, the provider must properly document the services through a Certificate of Medical Necessity ("CMN").

25. A written report supporting the radiology services is required. 42 CFR 415.172 et seq.; 60 Fed. Reg. 63124 (eff. Dec. 8, 1995).

26. If the technical component is completed (i.e., the radiologic images are generated), but the study is not utilized for diagnostic or therapeutic purposes relative to the patient encounter for which the study was performed, or is improperly documented, Medicaid and Medicare reimbursement for the study is not allowed or is rendered a nullity. See 42 U.S.C. 1395y(a)(1)(A); 42 CFR 411.15(k); 42 CFR Parts 405, 411, 46 Fed Reg. 48550 (Oct. 1, 1981).

## B.  DR. GALUTEN AND DEFENDANT'S RADIOLOGY SERVICES

27. At all relevant times herein, Defendant has operated a health care business in Miami-Dade County, providing a wide variety of health care services to the public, and seeking reimbursement for such services under the Medicaid and Medicare Programs.

28. On or about August 9, 2011, Defendant hired Plaintiff, Alvin Galuten, M.D., to be its employee and serve as a radiologist and the chairman of its radiology department.

29. Defendant's radiology department produced radiologic studies, including x-rays, ultrasound, and DEXA (bone densitometry).

30. During his employment, Dr. Galuten learned that a lot of Defendant's radiology and radiology-related equipment was inadequate, creating images that could not be properly interpreted or evaluated—i.e., images lacking diagnostic quality.  Further, some of the equipment made it impossible to view images properly, making evaluation impossible.

31. For example, at numerous and various times during his employment, Dr. Galuten complained to Defendant, through Dr. St. Anthony Amofah, Brodes H. Hartley, Jr., Michael Kordsmeier, Kay Dolan, and others, that the following studies were frequently non-diagnostic and/or not reimbursable:

    - that the Planar high-resolution monitors purchased from Transphoton Corporation were of substandard quality;
    - that poor quality (blurry, etc.) mammography studies were generated;
    - that the requisite paperwork on the first mammography machine was never submitted to the required agencies;
    - that because of transcription delays, mammography reports were not being sent out within the required time frame for reimbursement (3 days for an abnormal exam; 30 days for a normal exam);
    - that there was an overall backlog on radiology transcriptions—i.e., dictations that were not transcribed;
    - that there was a delay in exposure of spot films for fluoroscopy, resulting in poor quality images and risk of excess radiation for patients;
    - that there was an inadequate number of cassettes for fluoroscopy;
    - that blurry ultrasound images frequently were obtained; and
    - that artifact was frequently shown on plain films (x-rays).

4

32. Consequently, many of the radiology services being rendered were both dangerous to the health of patients (many of whom were being checked for cancer—e.g., breast cancer), and were not properly reimbursable under Medicaid and Medicare.

33. Plaintiff complained to Defendant that, consequently, Defendant was performing radiology studies on Medicaid and Medicare beneficiaries which were not performed in a proper, diagnostic manner, and which were not timely read or documented relative to patient encounter, in violation of Medicare and Medicaid rules.

34. Defendant submitted claims to Medicaid and Medicare for radiologic studies that were inadequately performed and/or not transcribed.

35. Concerned about these quality-of-care and compliance issues, and the attendant risks of medical malpractice that they also raised, Dr. Galuten also complained that Defendant was not providing him and others in the radiology department (particularly the technologist), and all radiology modalities (tests/diagnostic services) with full, adequate, and legally required professional liability coverage.  (Notably, mammography is the leading area of malpractice claims against radiologists.)

36. When Defendant continued to fail to correct these quality-of-care and compliance problems, Dr. Galuten refused to sign radiology reports:  He advised superiors with Defendant—many of whom are listed above—that his doing so not only would have constituted a wrongful attestation to the quality and diagnostic capacity of the services, but also potentially could expose him, Defendant, and others working for Defendant, to claims for medical malpractice and/or Medicare or Medicaid fraud.  It was also Plaintiff's intention, by refusing to sign radiology reports, to spur Defendant to fully address these major quality-of-care and compliance problems that were not being adequately addressed.

37. As a proximate cause of Dr. Galuten's complaints about these violations of health care laws and regulations, and his refusal to participate on them, Defendant retaliatorily fired him on or about April 17, 2012 and failed him to pay his last paychecks and accrued paid time off ("PTO")—totaling approximately $15,630.71 ($1,953.09 plus $13,677.62).

38. Defendant's employment manual or handbook provided that all employees would be paid all accrued but unused PTO at the time of separation from employment.

### C. KICKBACKS

39. Part of the cause of the inadequate radiology services was the source of the radiology equipment, and their manner of acquisition.

40. Specifically, during his employment, Dr. Galuten learned that Defendant had provided illegal kickbacks to a seller of radiology equipment, by paying far more than fair market value for shoddy equipment, in violation of the federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b.

41. Specifically, Defendant had purchased substandard, used radiology equipment, including substandard-quality Planar "high-resolution" monitors, a mammography unit, a PACS system, an ultrasound machine, a CT machine, and a DEXA (bone densitometry) machine—all bought from Transphoton Corporation—at grossly inflated prices, which constituted kickbacks. Sergio Cabrera, the officer/director of Transphoton who consummated the sales with Defendant, was also a member of the Board of Directors of Defendant—making the kickbacks also acts of self-dealing.

42. The above-described knowing or reckless violations of Medicare and Medicaid rules constitute violations of the federal Civil False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq., because it is illegal to submit claims for Medicaid or Medicare reimbursement when they involve inadequate medical services (especially grossly inadequate services as in the case at bar), and because AKS-tainted claims for reimbursement are deemed false claims under the FCA by the Patient Portability and Affordable Care Act ("PPACA"), Pub. L. No. 111-148 (2009).

### D. DEFENDANT SUBMITTED CLAIMS FOR REIMBURSEMENT FOR THE ABOVE-DESCRIBED RADIOLOGY SERVICES TO MEDICARE AND MEDICAID.

43. Through his approximately half-year of employment with Defendant as the chairman of its radiology department, Plaintiff acquired firsthand knowledge that Defendant actually billed Medicare and Medicaid for the non-compliant radiology studies and the services of its radiologists, and for such studies and services in general.

44. Both the former and the latter was confirmed by various persons who worked for Defendant, including Dr. Amofah, Kay Dolan, and persons in Defendant's billing department.

45. In addition, Plaintiff knows that they were billed because Defendant required him to fill out paperwork by which he assigned to Defendant his right to be reimbursed for the services he rendered.

### COUNT 1 OF 2:
### RETALIATORY DISCHARGE UNDER THE
### FEDERAL CIVIL FALSE CLAIMS ACT, 31 U.S.C. § 3730(h)

46. Plaintiff realleges and reavers the allegations of paragraphs 1-45 as if fully set forth herein.

47. Plaintiff complained many times to Defendant's agents or employees about lack of compliance with health care laws.

48. Plaintiff refused to participate in Defendant's lack of compliance with health care laws.

49. As a proximate result of these complaints, Plaintiff was discharged.

50. Even if Plaintiff were ever found to have been incorrect about Defendant's violations of one or more such laws or regulations, it was unlawful to retaliate against him for asserting such violations.

51. Plaintiff Alvin Galuten seeks all damages in the premises from Defendant, and requests that judgment be entered in his favor and against Defendant, under 31 U.S.C. § 3730(h), including, but not limited to, "all relief necessary to make the employee whole," double back pay, interest on the back pay, and "compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees."

### COUNT 2 OF 2:
### ATTORNEYS' FEES AND COSTS AS THE PREVAILING PARTY
### ON AN UNPAID WAGES CLAIM

52. Plaintiff realleges and reavers the allegations of paragraphs 1-45 as if fully set forth herein.

53. Plaintiff filed this lawsuit originally on April 17, 2014, alleging in part, specifically in Count 2 thereof, that Defendant had failed to pay him all wages owed to him for his approximately last two weeks of work—totaling approximately $15,630.71 ($1,953.09 plus $13,677.62).

54. That claim was for "UNPAID WAGES"—not for unpaid *minimum* wages pursuant to Fla. Stat. 448.110. The count never mentioned minimum wages. Had only minimum wages been sought, the amount claimed would have been a small fraction of the $15,630.71 that was claimed.

7

55. On or about October 2, 2014, Defendant tendered Plaintiff $15,630.71, less withholdings of $5,221.90 for federal income taxes, Social Security and Medicare.

56. That payment renders Plaintiff the prevailing party on that wage claim.

57. Fla. Stat. 448.08, entitled "**Attorney's fees for successful litigants in actions for unpaid wages**," provides as follows: "The court may award to the prevailing party in an action for unpaid wages costs of the action and a reasonable attorney's fee."

58. Plaintiff Alvin Galuten requests that judgment be entered in his favor and against Defendant for reasonable attorney's fees and costs pursuant to Fla. Stat. 448.08.

\* \* \*

59. Plaintiff demands a jury trial for all issues so triable.

Respectfully submitted:

s/ Steven F. Grover
-------------------------------------------
Steven F. Grover (131296)
For Steven F. Grover, PA
Wells Fargo Tower
One East Broward Blvd., Ste. 700
Fort Lauderdale, FL 33301
Tel.: 954-356-0005
E-mail: stevenfgrover@gmail.com
*Counsel for Plaintiff*

Certificate of Service

I hereby certify that I have served a copy of the above document upon all counsel of record by CM/ECF on this November 4, 2014.

s/ Steven F. Grover

_____
Steven F. Grover

Galuten.Complaint.FirstAmended.FINAL.110414